```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
MILL STREET PARTNERS, LLC,                       :
                    Plaintiff,                   :
                                                 :          OPINION AND ORDER
v.                                               :
                                                 :          18 CV 5465 (VB)
CITY OF NEWBURGH and MICHAEL G.                  :
CIARAVINO,                                       :
                    Defendants.                  :
--------------------------------------------------------------x
```

Briccetti, J.:

Plaintiff Mill Street Partners, LLC ("Mill Street") brings this action under the Fair Housing Act ("FHA") and various New York state laws against the City of Newburgh (the "City") and Michael G. Ciaravino, the City manager, in connection with Mill Street's failed attempt to build a mixed-use commercial and residential building for low-income residents in downtown Newburgh.

Before the Court is defendants' motion to dismiss the amended complaint pursuant to Rules 12(b)(1) and 12(b)(6). (Doc. #23).

For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.

The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1367.

## BACKGROUND

In deciding the pending motion, the Court accepts as true all well-pleaded factual allegations in the amended complaint and draws all reasonable inferences in Mill Street's favor, as set forth below.

I.      The Development Agreement

In or around May 2011, the City solicited proposals from private developers to redevelop an abandoned city property along the downtown Broadway corridor. Bounded by 1st Street,

1

Broadway, Johnston Street, and Lander Street, the nearly 2.5-acre property consists of seventeen city-owned parcels and one privately-owned parcel.

Mill Street, a private developer that specializes in affordable housing, submitted a proposal, and on May 29, 2012, the City designated Mill Street as its "preferred developer" for the project. On October 23, 2012, Mill Street and the City entered into the Development Agreement. (See generally Doc. #18 ("Am. Compl.") Ex. F).

By the terms of the agreement, the project would consist of 103 residential rental apartments, a ground floor supermarket, other retail space, and at least one parking space per residential unit. Mill Street would obtain all the necessary permits, licenses, easements, and local government approvals at its own expense and seek public funding for the project. Upon securing all approvals and funding, the parties agreed Mill Street would purchase all the City-owned parcels of land.

For its part, the City agreed to sell its parcels with insurable titles "at or prior to closing of the construction financing." (Am. Compl. ¶ 87). The city also agreed to "cooperate . . . in good faith" with Mill Street, and specifically stated it would issue the appropriate letters or resolutions of support and assist in obtaining licenses, approvals, and permits. (Id. ¶¶ 80–84).

The Development Agreement had a term of twenty-four months and would expire in October 2014.

II.  The City's Initial Cooperation

Mill Street alleges the City initially adhered to its obligations under the Development Agreement. For instance, in 2013, the City created a specially permitted use for the project in its zoning district, granted Mill Street a special permit to construct the property, and adopted a resolution of support endorsing Mill Street's application for public funding. When Mill Street

did not secure the necessary funding by the 24-month term in the Development Agreement, the City also voted and passed the first amendment to the Development Agreement, ultimately extending Mill Street's deadline to secure approvals and public funding until May 1, 2015.

On December 12, 2013, local landlords who opposed the project brought an Article 78 proceeding against the City and Mill Street to challenge the special use permit. In June 2014, the Supreme Court, Orange County determined that the project was not permitted in the zoning district where it was located and remitted the matter to the City.

In July 2015, the City adopted a form-based zoning code for its entire downtown. As part of this zoning update, the City included various provisions in the new zoning code to permit the project to proceed without the need for variances. While the term of the Development Agreement was tolled during the pendency of the lawsuit, the lawsuit "significantly delayed" the project. (Am. Compl. ¶ 141).

III.  The New City Administration Seeks to Undermine the Project

In 2015, the City administration changed. Several new city council members were elected and Ciaravino was appointed to be city manager.

Local landlords still opposed the project, and Mill Street alleges this opposition was racially motivated. According to Mill Street, the project's opponents said Newburgh was already a "dumping ground" and "every time the City starts getting better, we put in another low income Project." (Am. Compl. ¶ 136). Opponents allegedly said the project units "are not for people who are working"; it "would allow Orange County to drop off their problems in Newburgh"; and it would "attract more of them." (Id. ¶¶ 132–33).

Ciaravino, the new city manager, allegedly sympathized with these landlords and sought to undermine the project. For instance, Mill Street sought a second year-long extension of the

Development Agreement, presenting the draft amendment to the city council in September 2015. The city council approved the amendment the following month, but Ciaravino allegedly delayed signing the amendment for five months, until March 2016. Ciaravino also allegedly waited eight months until August 2016 to sign the City's ownership proxy statement, a document required for the planning board's project review. In addition, Ciaravino allegedly failed to fill open seats on the planning board and the Architectural Review Board, which further delayed the project. Finally, Ciaravino allegedly appointed two well-known opponents of the project to city boards that would evaluate Mill Street's proposal.

Under the Development Agreement, Mill Street had to notify the City if it had violated its obligations. Accordingly, on October 4, 2016, Mill Street sent the City a Notice of Default. In the next two weeks, the city council issued the requested resolution of support for the project, and the planning board granted Mill Street conditional site plan approval.

IV. 18 Johnson Street Deed

At a January 23, 2017, city council meeting, Stuart Sachs, one of the landlords who opposed the project and the principal litigant behind the 2015 zoning lawsuit, presented the city council with a copy of a purported 1956 deed for 18 Johnston Street, the largest parcel of the project site.

The city's deed contained a restriction that if the property was ever used for anything "other than municipal purposes," ownership of the property would revert back to the grantor, Newburgh Housing Authority ("NHA"). (Am. Compl. ¶ 237). According to Mill Street, this reverter clause precluded the City from conveying 18 Johnston Street for the project because the private, residential, and commercial use of the property would cause ownership to revert to the NHA. Without ownership over the parcel, Mill Street claims the project could not proceed.

4

In the meantime, the city council approved a third amendment to the Development Agreement, extending the agreement's term for another year until March 2018.

Mill Street staff discussed removing the reverter clause with NHA staff, who said any decision would need to be approved by the NHA Board of Commissioners, the body that originally added the clause.

On June 15, 2017, Mill Street appeared before the NHA board. Ciaravino had appointed Sachs, the project's opponent, to the NHA board. Sachs allegedly "berat[ed]" Mill Street and its representatives throughout their presentation. The NHA board ultimately took no action on the request and adjourned until September 2017.

In August 2017, the NHA's legal counsel advised Mill Street that the NHA board would not act on Mill Street's request to release the reverter clause "unless and until" the City confirmed that it supported Mill Street's request. (Am. Compl. ¶ 284).

On August 30, 2017, Mill Street sent a letter requesting the City provide a letter of support to the NHA before the board's September 15, 2017, meeting.

On September 11, 2017, the city council voted not to issue a resolution of support for the NHA to release the reverter clause. Without the letter of support, the NHA board did not act to remove the reverter clause, which remained in place as of the filing of the amended complaint. On September 15, 2017, Mill Street served the City with its second Notice of Default. The city took no action.

Without the largest parcel, Mill Street alleges it could not apply for funding within the 2017 funding cycle, which required that an application be submitted in October or December 2017. The Development Agreement expired in March 2018, and Mill Street was unable to pursue funding for a later cycle.

Mill Street alleges it spent more than $1.5 million pursuing the project.

**DISCUSSION**

I. Standard of Review

    A. Rule 12(b)(1)

"[F]ederal courts are courts of limited jurisdiction and lack the power to disregard such limits as have been imposed by the Constitution or Congress." Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v. Dupont, 565 F.3d 56, 62 (2d Cir. 2009) (internal quotation omitted). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Nike, Inc. v. Already, LLC, 663 F.3d 89, 94 (2d Cir. 2011) (internal quotation omitted). A court lacks the judicial power to hear a plaintiff's claims when he or she does not have standing. Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C., 433 F.3d 181, 197–98 (2d Cir. 2005). The party invoking the Court's jurisdiction bears the burden of establishing jurisdiction exists. Conyers v. Rossides, 558 F.3d 137, 143 (2d Cir. 2009).

    B. Rule 12(b)(6)

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the U.S. Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). First, a plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and thus are not sufficient to withstand a motion to dismiss. Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, a complaint's allegations must meet a standard of "plausibility." Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

II.   Standing

Defendants argue Mill Street lacks standing to bring this action under the FHA because it has not plausibly alleged a causal relationship between defendants' conduct and the project's failure.

The Court disagrees.

"Standing under the FHA, whether suit is brought under section 810 or section 812 of the Act, is coextensive with Article III standing." Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, 316 F.3d 357, 362 (2d Cir. 2003). Constitutional standing requires a plaintiff to establish at minimum three elements: (i) he or she suffered an "injury in fact"; (ii) a causal connection between the injury and defendant's conduct; and (iii) a federal court decision is likely to redress the injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992). To demonstrate a causal connection between the injury and the defendant's conduct, a plaintiff must demonstrate "distinct and palpable injuries that are fairly traceable to [the defendant's] actions." Anderson Grp., LLC v. City of Saratoga Springs, 805 F.3d 34, 45 (2d Cir. 2015) (quoting LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 425 (2d Cir. 1995)).

At this early stage of the case, Mill Street plausibly has alleged facts to suggest its injuries are fairly traceable to the City's actions, affording it standing under the FHA to maintain this action. Plaintiffs allege the NHA's legal counsel advised Mill Street that the NHA's Board of Commissioners "would not act on Mill Street's request to release the Reverter Clause unless, and until, the City confirmed that it supported Mill Street's request." (Am. Compl. ¶ 262). The city council then voted not to issue a resolution in support. As a result, the NHA did not remove the reverter clause, which remains in effect as of the date of the amended complaint. Furthermore, plaintiffs alleged Ciaravino appointed Sachs, a vocal opponent of project, to the NHA board shortly before the board's consideration of Mill Street's request to remove the reverter clause. Taken together, these actions plausibly allege a causal connection.[1]

Defendants argue that the removal of the reverter clause was not within the City's power. They maintain that even if the City had issued a letter of support, there is no guarantee the NHA would have removed the reverter clause, and therefore the City was not the cause of the project's failure. Mill Street alleges, however, that the NHA would not even consider the request "unless and until" the City offered its support, and thus without the City's support, the project had no hope of success.

Accordingly, at this stage of the case, Mill Street has standing to proceed.

III.  Fair Housing Act Claim

The FHA makes it unlawful "[t]o refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race, color, . . . or national origin." 42 U.S.C. § 3604(a). A plaintiff can bring an FHA discrimination claim under a theory of disparate

---

[1] Of course, this inquiry can be revisited at summary judgment or trial if discovery reveals it is not supported by evidence. See Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, 316 F.3d at 362.

treatment and disparate impact. Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, 316 F.3d at 366.

Defendants argue Mill Street fails to state a claim under either theory, because it fails to allege defendants had animus toward the project or that defendants' actions had a disproportionate impact on those set to benefit from the project.

For the following reasons, the Court disagrees.

A. Disparate Treatment

To assert a disparate treatment-based FHA claim, a plaintiff must allege facts suggesting "animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." Mhany Mgmt., Inc. v. County of Nassau, 819 F.3d 581, 606 (2d Cir. 2016) (quoting LeBlanc-Sternberg v. Fletcher, 67 F.3d at 425). Evidence that racial animus played a significant factor can be demonstrated by the sequence of events, including "abruptly revers[ing] course in response to vocal opposition" or departing from normal procedures, as well as contemporaneous statements by members of the decision-making body. Id. at 606–07. "If the motive is discriminatory, it is of no moment that the complained-of conduct would be permissible if taken for nondiscriminatory reasons." LeBlanc-Sternberg v. Fletcher, 67 F.3d at 425.

Mill Street plausibly alleges facts suggesting racial animus played a significant factor in the opposition to the project and the people it served. For instance, Mill Street points to opponents' public statements from which discriminatory intent could be inferred, including calling Newburgh a "dumping ground," and stating "every time the City starts getting better, we put in another low income Project" (Am. Compl. ¶ 136); and that the project units "are not for

9

people who are working"; "would allow Orange County to drop off their problems in Newburgh"; and "attract more of them," (id. ¶¶ 132–33). According to Mill Street, the City ultimately capitulated to the project's opposition. Indeed, after initially supporting the project, the new administration abruptly reversed course. Further, Ciaravino appointed the project's chief opponent to the NHA board shortly before the board was to vote on the removal of the reverter clause, which would prove the final blow for the project. Finally, the city council decided not to issue a letter supporting Mill Street's request to remove the reverter clause. The mayor stated at that time, "the project 'is not the best use of the [property].'" (Id. ¶ 193).

These allegations, if proven, would support the inference that racial animus was a significant factor in the City's refusal to support the project.

B. Disparate Impact

To state a claim under a disparate impact theory of discrimination, a plaintiff must plausibly allege that an "outwardly neutral practice has a significantly adverse or disproportionate impact" on persons in the protected class. Tsombanidis v. W. Haven Fire Dep't, 352 F.3d 565, 574–75 (2d Cir. 2003), superseded on other grounds as stated in Mhany Mgmt., Inc. v. County of Nassau, 819 F.3d at 619. Under a disparate impact theory, a plaintiff need not show discriminatory intent but must show that the practice "actually or predictably results in discrimination." Id.

Mill Street has sufficiently alleged the City maintained a facially-neutral policy or practice in connection with the Mill Street project. Mill Street faced various delays due to the City's failure to sign important documents and fill board seats, and the City's appointment of vocal opponents of the project to city boards. According to Mill Street, ultimately the City's refusal to issue a letter of support on Mill Street's behalf doomed the project.

Mill Street has also alleged this policy had a significantly adverse or disproportionate impact on the minority groups that would benefit from the project. For instance, Mill Street alleges a predominately low-income minority population lives in downtown Newburgh, where rates of minority and low-income populations far exceed the national and county averages. The city allegedly suffers from a shortage of habitable, affordable housing to support its low-income and racial/ethnic minority population—a fact recognized in the City's 2015 Consolidated Plan. Mill Street alleges the majority of existing developments are at or near capacity, and the project would have provided much needed housing, jobs and other resources to this population. Therefore, Mill Street has plausibly alleged facts to support a disparate impact-based FHA claim.

Accordingly, defendants' motion to dismiss the FHA claim is denied.[2] Mill Street may proceed under both disparate treatment and disparate impact theories of discrimination under the FHA.

IV. <u>Tortious Interference Claim</u>

Defendants argue Mill Street's tortious interference claim against Ciaravino is barred by New York's governmental function immunity.

The Court disagrees.

Governmental function immunity shields public entities or persons "from liability for discretionary actions taken during the performance of governmental functions." <u>Valdez v. City of New York</u>, 18 N.Y.3d 69, 76 (2011). However, the municipal defendant must "timely raise[] the defense and prove[] that the alleged . . . act or omission involved the exercise of discretionary

---

[2] Having denied defendants' motion to dismiss the FHA claim, the Court will exercise supplemental jurisdiction over Mill Street's state law claims pursuant to 28 U.S.C. § 1367. The facts under Mill Street's FHA and state law claims substantially ovrlap. See <u>Achtman v. Kirby, Mcinemey & Squire, LLP</u>, 464 F.3d 328, 335 (2d Cir. 2006).

authority" and "establish[] that the discretion possessed by its employees was in fact exercised in relation to the conduct on which liability is predicated." Id.

Without the benefit of evidence, this defense is premature. Defendants may reassert the governmental function immunity defense with evidentiary support at a later stage in this case.

Accordingly, Mill Street's tortious interference claim against Ciaravino may proceed.

V.      Misrepresentation and Breach of the Covenant of Good Faith and Fair Dealing Claims

Defendants argue Mill Street's fraudulent and negligent misrepresentation claims and breach of the covenant of good faith and fair dealing claim should be dismissed as they are both duplicative of the breach of contract claim.

The Court agrees.

"Under New York law, parallel fraud and contract claims may be brought if the plaintiff (1) demonstrates a legal duty separate from the duty to perform under the contract; (2) points to a fraudulent misrepresentation that is collateral or extraneous to the contract; or (3) seeks special damages that are unrecoverable as contract damages." Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 183 (2d Cir. 2007). A fraud claim does not lie if "premised upon an alleged breach of contractual duties and the supporting allegations." Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996).

Similarly, "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim [is] based on the same facts." Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002).

Here, Mill Street attempts to use the same facts underlying its breach of contract claim to support its claims for misrepresentation and breach of the implied covenant of good faith and fair dealing. As to its breach of contract claim, Mill Street alleges the City breached various material

terms of the Development Agreement by failing to cooperate in good faith, refusing to issue resolutions of support, and refusing to address the reverter clause. Mill Street seeks to use the facts underlying those very same breaches to support its claim concerning the City's alleged misrepresentation (i.e., knowledge of the reverter clause) and the City's breach of the covenant of good faith and fair dealing claims (i.e., failure to cooperate and act in good faith). Nor does Mill Street allege the City had a separate legal duty to Mill Street outside the contract or that Mill Street is entitled to special damages unrecoverable as contract damages.

Accordingly, Mill Street's claims for fraudulent and negligent misrepresentation and breach of the covenant of good faith and fair dealing are dismissed.

VI.   Notice of Claim

Defendants argue Mill Street's surviving claims are subject to dismissal because its Notice of Claim was not timely served within the limitations period set forth in the City charter.

The Court disagrees but finds that because Mill Street did not include its NYSHRL claim in its notice, its NYSHRL claim is dismissed.

"A plaintiff must abide by the statutory requirements for notification to the appropriate public body or official" or face dismissal. Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., Inc., 429 F. Supp. 2d 582, 605 (S.D.N.Y. 2006). "Any cause of action or theory of liability not directly or indirectly mentioned in the notice of claim may not be included in a subsequent lawsuit." Fincher v. County of Westchester, 979 F. Supp. 989, 1003 (S.D.N.Y. 1997). Here, the City charter requires that a party file a Notice of Claim within three months of the claim's accrual. Generally, a claim accrues when a plaintiff knew or had reason to know of the injury serving as the basis for his claim. Heins v. Potter, 271 F. Supp. 2d 545, 554 (S.D.N.Y. 2003).

Mill Street's Notice of Claim was timely. Mill Street served the City with a Notice of Default on September 14, 2017. Under the Development Agreement, the City had sixty days to cure the alleged default, here, until November 14, 2017. It only became evident that the City would not attempt to resolve the alleged default after the sixty-day period lapsed on November 14, 2017. Indeed, Mill Street alleges the City had taken corrective action within the sixty-day period after having received a prior Notice of Default. But this time, by November 14, 2017, the City had not acted. Therefore, the City's ninety-day limitations period for Mill Street's Notice of Claim began to run on November 14, 2017, and elapsed on February 12, 2018. Accordingly, Mill Street's February 9, 2018, Notice of Claim was timely.

However, Mill Street's NYSHRL claim was not included in its Notice of Claim. Mill Street does not dispute this or otherwise argue its NYSHRL claim is not subject to dismissal.

Accordingly, Mill Street's NYSHRL claim is dismissed.

**CONCLUSION**

The motion to dismiss is GRANTED IN PART and DENIED IN PART.

Mill Street's NYSHRL, breach of the duty of good faith and fair dealing, and fraudulent and negligent misrepresentation claims are dismissed. Mill Street's FHA, breach of contract, and tortious interference claims may proceed.

Defendants shall file an answer to these remaining claims by September 23, 2019.

The Clerk is instructed to terminate the motion. (Doc. #23).

Dated: September 9, 2019
       White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge